**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00134-CR**
_____

**DRAYTON REED HINTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-02-02097-CR**

**MEMORANDUM OPINION**

A Montgomery County grand jury indicted Drayton Reed Hinton for the first-degree felony offense of injury to a child. *See* Tex. Penal Code Ann. § 22.04(a), (e). Hinton entered an open plea of guilty to the second-degree felony offense of injury to a child. Hinton elected to have the trial court assess punishment. Following a punishment trial, the trial court sentenced Hinton to twenty years of confinement in the Texas Department of Criminal Justice Institutional Division. Hinton timely

appealed his sentence challenging the admission of certain evidence.[1] For the following reasons, we affirm the trial court's judgment.

## Background

After the premature birth of their granddaughter, F.S.,[2] Hinton and his wife became her guardians. Hinton was unemployed at the time, but his wife worked, so he became F.S.'s primary caregiver. At the time Hinton began caring for F.S., he was being treated for low testosterone levels by Lynn Marquardt, a chiropractor and nurse practitioner. Marquardt prescribed a topical testosterone cream for Hinton to help increase muscle mass and to lose weight.

During the first few months of F.S.'s life, her regular medical examinations revealed normal female genitalia; however, in February 2016, there was marked clitoral enlargement noted by her pediatrician. Accordingly, the pediatrician recommended a consult with an endocrinologist. This condition progressively became worse, and she had repeat testosterone levels of 2,000 or greater. The evidence established that for a female child F.S.'s age, the free testosterone levels

---

[1] We have liberally construed Hinton's briefing in this case and addressed his complaints as raised in the "Grounds for Review" portion of his brief. *See* Tex. R. App. P. 38.9.

[2] We refer to the victim and her family members with pseudonyms or initials, to conceal their identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

should be undetectable. Additionally, the medical records and testimony established that at sixteen-months-old, F.S. had an accelerated bone age of three years.

Dr. Rebecca Girardet, a pediatrician specializing in child abuse, testified that in February 2017, when F.S. was admitted to Children's Memorial Hermann Hospital, the admitting medical team called her for a consult. She explained the admitting medical team had concerns about medical neglect given F.S.'s elevated testosterone levels, the family's refusal to follow recommendations to prevent F.S.'s exposure, a concern about possible inappropriate sexual contact, and an open CPS case. Dr. Girardet testified and her report noted that the medical team ruled out any endogenous causes for F.S.'s elevated testosterone levels, concluding the source was exogenous and "continued contact with testosterone cream appears by far to be the most likely cause of her symptoms[.]"[3]

The evidence established that F.S.'s treating physicians explained to Hinton repeatedly that exposure to his testosterone cream likely caused F.S.'s virilization, genital abnormalities, and accelerated growth. The evidence further established that F.S.'s physicians told Hinton he must take precautions to prevent her further exposure to the testosterone cream, he should obtain a second opinion about his

---

[3] Dr. Girardet explained that "[e]ndogenous cause would mean there would be something going on inside [F.S.'s] body that's causing the testosterone levels to be abnormally high like a tumor whereas an exogenous source would be something from outside her body like a testosterone supplement."

3

continued use of the medication, and even abstain from using it while the infant was in his care. The evidence also showed that despite these repeated warnings, Hinton continued to refill the prescriptions for the testosterone cream and use the topical cream. Dr. Girardet also testified at trial that once Hinton no longer had any physical contact with F.S., her testosterone levels dropped.

Dr. Duong Tu, F.S.'s treating pediatric urologist, also testified. Dr. Tu practices at Texas Children's Hospital, where he treated F.S. in July 2017 after she was referred to their Gender Medicine Clinic. Dr. Tu described his observations of F.S., which included her distress, her deep voice, and the appearance of her genitals. Dr. Tu explained that in their clinic they see many patients with clitoromegaly,[4] but this was by far the most severe case he had seen. Dr. Tu also described how the elongation of F.S.'s clitoris distorted the labia and changed the structure of her genital area. Dr. Tu performed surgery to reduce the size of F.S.'s clitoris, and he explained he had to balance reducing the size and eliminating tissue overgrowth with preserving function. He testified that the area is "still prominent[]" after surgery, and the amount of the tissue he removed was the most he ever had to remove in a case like this. Dr. Tu described F.S.'s case as "unprecedented[]" and said they would have

---

[4]    Clitoromegaly    is    defined    as    "[a]n    enlarged    clitoris." https://dictionary.com/browse/clitoromegaly (last accessed 12/7/2020).

4

to wait and see how this condition impacted the child, which he discussed with her caregivers.

Both physicians described the significance of F.S.'s condition and the life-long impacts it would have on her. Dr. Girardet explained that the accelerated growth rate could even impede F.S.'s ability to walk, as well as her overall mobility. Dr. Tu explained that F.S. would likely require further reduction surgery as she approached puberty. He also explained the negative psychological ramifications associated with these surgeries and discussed the potential effects of high levels of testosterone can have on a child generally.

T.L., a maternal great-aunt, also testified. T.L. became F.S.'s primary caregiver after the surgery and during her follow-up medical treatment.[5] T.L. testified regarding the permanent damage F.S. has suffered. Specifically, she described that F.S. has negative playground interactions because of her deep voice. T.L. described the difficulties she encountered anytime she had to change F.S.'s diaper in public. T.L. also testified that F.S. required physical therapy and braces on her arms due to the muscular issues associated with her excessive exposure to testosterone hormones.

Hinton testified on his own behalf during the punishment trial. He admitted the pediatrician and endocrinologist both told him that he caused and was negatively

---

[5] Ultimately, T.L.'s sister planned to adopt F.S.

5

affecting F.S.'s condition by continued exposure to the topical testosterone cream, but he did not believe them. Hinton told the court that F.S.'s doctors instructed him to stop using the cream, but he did not listen to them. Hinton testified he did not trust F.S.'s doctors' opinions regarding the connection between his use of the cream and her condition, rather he trusted Marquardt, who originally prescribed it to him, and it did not matter to him that she was not a medical doctor. He testified that when F.S.'s doctors told him to get a second opinion about the use of testosterone cream around the infant, he instead returned to Marquardt. According to Hinton, Marquardt told him what he wanted to hear, which was that he could continue using the cream and that it was not the cause of F.S.'s medical problems.

Marquardt, the provider who originally prescribed the testosterone cream for Hinton, also testified. She explained why she prescribed the testosterone cream for Hinton. Marquardt testified that Hinton reported a positive side effect of the cream was an increased libido. Marquardt confirmed that Hinton brought F.S. into her office because he wanted Marquardt to look at the baby, and she observed the genital anomalies. However, Marquardt disputed Hinton's claim that she told him the cream could not cause the anomalies and she testified she advised him to take precautions against anyone contacting the cream after applying it to himself. She testified that if Hinton said that she told him the cream could not cause F.S.'s condition, he would be lying. Marquardt testified that Hinton should have followed F.S.'s doctors'

6

advice. She confirmed the primary reason she stopped prescribing the cream for Hinton was because he reported the baby's doctors advised that the cream caused the condition, which concerned her. Marquardt testified that only one or two incidental transfers of the testosterone cream would not cause a child to grow a penis; F.S.'s condition resulted from a prolonged, sustained exposure.

Additional evidence admitted at trial over defense objection included photographs of marijuana discovered in the home and forensic computer downloads/reports of a computer found in Hinton's home. Photographs of the inside of the home depicting clutter, including used condoms, were also admitted over defense objection.

Witnesses testified without objection from Hinton's attorney regarding computer searches, male enhancement items found in the home, used condoms found in the home, and the condition of the home generally. Two detectives from the Montgomery County Sheriff's Department testified. Detective Christopher Evans discussed being assigned the case and that two reports came in regarding F.S., one in November 2016 and one on February 9, 2017. Detective Evans testified that F.S. "seemed to have a large muscular structure for her age. She had a very monotoned, gravely and deep voice. She had only what I can describe – her clitoris looked like a penis." Detective Evans described the photos and video he took at the hospital to document what they "were dealing with[]" for the DA's office.

7

During the investigation, law enforcement executed "[r]esidential and electronic[]" search warrants at Hinton's home. Detective Sergeant Christopher Ansley with the Montgomery County Sheriff's Department assisted in executing a search warrant at the home. Sergeant Ansley described the condition of the home and the items he located while executing the search warrant. Sergeant Ansley stated that he found used condoms in the home and located evidence of drug use in the form of a "few bags of a green leafy substance[]" which he recognized from his training and experience as marijuana.[6] Sergeant Ansley also described the home's dirty, unsanitary condition and that they found multiple used condoms laying around inside the residence, together with male enhancement gel. With the exception of renewed objections to the photographs of the marijuana and discussion of the amount of marijuana,[7] the defense did not object during Detective Ansley's testimony regarding the home's condition.

In addition to the detectives' testimony, Jeffery Chappell, a forensic computer expert with the Department of Homeland Security, also testified about the analysis of Hinton's computer. He confirmed there were searches for testosterone on the

---

[6] The defense did not object to this testimony. Following the testimony, the State sought to introduce photographs of the marijuana, and the defense objected based on relevance grounds. The State argued for purposes of the punishment hearing, it was an extraneous bad act, and the trial court overruled the objection and admitted the photographs of the bags of marijuana.

[7] The defense did not object to Sergeant Ansley's testimony that they located multiple bags of marijuana in the home.

computer and searches regarding incestual sexual relationships between grandparents and grandchildren and specifically one for "granddaughter sucks grandpa." Prior to Chappell's testimony, the defense objected to the introduction of the forensic extractions of the computer contained in two exhibits, arguing that a pornographic search was not an illegal or bad act since no pornography was actually downloaded. Further, it was argued the exhibits were more prejudicial than probative and irrelevant. The trial court sustained in part the objections and overruled them in part, limiting the information to "familial relationship inquiries[]" and testosterone searches and noting the relevance of those items under article 37.07.

The trial court sentenced Hinton to twenty years of confinement. Hinton complains that the trial court improperly admitted certain evidence during the punishment trial. To the extent we can ascertain the issues from his briefing, Hinton appears to complain about the trial court's admission of evidence pertaining to the following: (1) marijuana seized in the home during the execution of a search warrant; (2) a Toshiba laptop computer and related "bad acts" information seized in the home during the execution of a search warrant; (3) photographs of the home depicting used condoms strewn about; (4) testosterone prescriptions; (5) video evidence of F.S. crying; (6) and the admission of a chronological summary of medical records with the accompanying denial of the defense's objections under Texas Rules of Evidence 611 and 1006.

## Standard of Review

We review a trial court's decision admitting evidence in the punishment phase of a trial under an abuse-of-discretion standard. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). We will not disturb the trial court's evidentiary rulings absent an abuse of discretion. *Beham*, 559 S.W.3d at 478; *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007). A trial court abuses its discretion only if its decision lies outside the "'zone of reasonable disagreement.'" *Beham*, 559 S.W.3d at 478; *Davis*, 329 S.W.3d at 803. If a trial court's evidentiary ruling is correct on any applicable theory of law, we uphold that decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

A trial court's erroneous admission of evidence is non-constitutional error subject to a harm analysis pursuant to Texas Rule of Appellate Procedure 44.2(b). *See* Tex. R. App. P. 44.2(b); *see also Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). Unless non-constitutional error affects the substantial rights of the defendant, we must disregard it. *See Taylor*, 268 S.W.3d at 592; *see also* Tex. R. App. P. 44.2(b). A proper harm analysis must consider unchallenged evidence that proves the same fact as the challenged evidence. *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (improper admission of evidence is not reversible if the same facts are shown by other evidence which is unchallenged). "[O]verruling an

10

objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Id.*

## Applicable Law

In pertinent part, the Texas Code of Criminal Procedure article 37.07 provides that

> [r]egardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1). "In a non-capital felony trial, evidence is admissible during the punishment phase if 'the court deems [it] relevant to sentencing.'" *Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009) (quoting Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1)). Determining admissibility during the punishment phase is a policy function rather than one of relevancy. *Id.* (quoting *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999)). Moreover, Texas Rule of Evidence 401's definition of "relevant" is of little help since "the factfinder's role during the guilt phase is different from its role during the punishment phase." *Id.* at 552. If evidence assists the factfinder in deciding the

11

appropriate sentence for the defendant given the facts of the case, then it is relevant. *Id.* (citation omitted). The Court of Criminal Appeals has explained, "[i]nevitably, '[d]eciding what punishment to assess is a normative process, not intrinsically factbound.'" *Beham*, 559 S.W.3d at 478 (quoting *Murphy v. State*, 777 S.W.2d 44, 63 (Tex. Crim. App. 1989) (plurality op. on reh'g)).

## Analysis

### Marijuana

One of Hinton's complaints in his first ground for review involves the admission of evidence regarding marijuana found in the home. During the punishment trial, the State sought to introduce multiple photographic exhibits of marijuana seized in Hinton's home during the testimony of Sergeant Ansley, who participated in executing a search warrant there. The defense objected based on relevance, to which the State responded that this was a punishment hearing, it was an extraneous bad act, and the Court would hear evidence it was more than a user amount of marijuana. The trial court overruled the objection and admitted the photos. Thereafter, Sergeant Ansley testified without objection that police found multiple bags of marijuana in the home. When the State sought to establish the amount of marijuana found in the home, the defense re-urged its objection to the photos based on relevance. Thereafter, the trial court sustained the defense's leading objection

12

regarding the quantity of marijuana but overruled the defense's objection that a specified amount of marijuana constituted a state jail felony.

We cannot say that the trial court abused its discretion in this felony injury-to-a-child case by admitting evidence of illegal drugs found in the defendant's home where the child resided with him and specifically that the trial court's decision to admit the evidence was outside the zone of reasonable disagreement. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1). Moreover, because there is no indication the trial court considered this "bad acts" evidence without determining whether it had been proven beyond a reasonable doubt or considered it at all in arriving at Hinton's sentence, we overrule this issue. *See Williams v. State*, 958 S.W.2d 844, 845 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

**Computer Searches**

In his first and fifth "Grounds for Review," Hinton complains about evidence the trial court admitted of computer searches of a computer found in his home.[8] The State sought to admit exhibits of searches conducted on a Toshiba laptop computer belonging to the defendant and seized from his home during the execution of a search warrant. Specifically, the State wanted to introduce evidence of a forensic analysis showing searches for testosterone and familial pornographic searches including

---

[8] Hinton raises these complaints in his "Grounds for Review" I and V. For purposes of organization and clarity, we discuss them together here.

13

grandparents. The defense initially objected on various grounds, including relevance, no foundation, hearsay, and facts not in evidence, which the trial court overruled while the State attempted to lay the foundation for how the computer was seized. Prior to questioning witnesses about the contents, the defense again objected to the State's computer extraction exhibits on multiple grounds, specifically, that there were searches but no pornography was found on the computer, the searches did not violate the law, and it was not evidence of a bad act. Defense further objected that the evidence was not relevant to the offense for which he was being prosecuted as the offense was for injury to a child and not sexual assault. The trial court overruled the defense's objections and admitted the exhibits for the limited purpose concerning testosterone searches that the court found relevant based on 37.07 and the incestual relationship searches, which the court found relevant to the crime for which Hinton was being prosecuted. Thereafter, the State questioned the computer analyst about the searches, and he confirmed there were searches for incestual sexual relationships discovered on the computer, including one for "granddaughter sucks grandpa." The computer analyst also confirmed there were searches related to testosterone on the device as well.

The defense failed to contemporaneously object during the computer expert's testimony or obtain a running objection, and therefore failed to properly preserve error. *See* Tex. R. App. P. 33.1(a) (requiring a timely objection as a requisite to

14

presenting a complaint for appellate review); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (noting that objections to challenged photos did not preserve error for all other gang related testimony). The defense's initial objections to the exhibits showing computer searches did not preserve error for the computer analyst's testimony. *See Martinez*, 98 S.W.3d at 193. A party must continue to object each time inadmissible evidence is offered, request a hearing outside the jury's presence, or obtain a running objection.[9] *See id.* The Court of Criminal Appeals has explained that "'it is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered.'" *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) (quoting *Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984)). We overrule this ground for review.

**Photographs of the Home**

In his second issue on appeal, Hinton complains that the trial court erred by admitting photographs that showed the cluttered home and used condoms. The trial judge overruled the defense's relevance and 403 objections that certain photographs

---

[9] While we note this was a bench trial and no jury was present, the defense's objection was to the exhibits containing the forensic computer downloads. While Hinton preserved error as to the reports, he failed to preserve error as to all other evidence or testimony regarding the computer searches. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).

of used condoms, male enhancement products, and nude photographs found in the home and determined those were "probative as to the issue at hand."[10] *See* Tex. R. Evid. 402 (deeming irrelevant evidence inadmissible), 403 (permitting the exclusion of relevant evidence if its probative value is substantially outweighed by a danger of undue prejudice).

Here, the trial court, as the factfinder, could have found that this evidence was relevant to punishment as it went to the type of environment in which Hinton kept F.S. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1). Although Hinton objected to the admission of certain photographs, he failed to object to the State's questioning of Sergeant Ansley regarding the condition of the home or obtain a running objection. *See Martinez*, 98 S.W.3d at 193. The officer described the home as "[v]ery cluttery, messy in nature." The officer testified they located male enhancement products in the home, as well as observed used condoms laying about. This unchallenged testimony was cumulative of the photographs, and therefore, even if we assume it was error to admit the photographs, such error was harmless. *See Ethington*, 819 S.W.2d at 858.

---

[10] The trial court sustained the objection as to some of the exhibits, concluding they were duplicative. During a lengthy discussion, in addition to relevance and prejudice objections, the defense objected to two other extraneous offense exhibits, arguing there was not a final conviction and the complaining witness could not be located and therefore, could not be cross-examined. The trial court sustained the objections to those exhibits.

16

**Testosterone Prescriptions**

In his third and seventh "Grounds for Review," Hinton contends that his testosterone cream was "prescribed by his doctor and [had] no relevancy to the case at all[.]" We disagree. The indictment alleged that Hinton "cause[d] serious bodily injury" to F.S. by "causing testosterone to contact the body of F.S.," and Hinton pled guilty to injuring the child by exposing her to his testosterone cream. *See* Tex. Penal Code Ann. § 22.04. Dr. Girardet testified and the medical records established that Hinton continued to use the cream and refill the prescriptions despite doctors' warnings to the contrary. This evidence came in without objection.

These testosterone prescriptions dealt with "the circumstances of the offense for which [Hinton was] being tried[.]" *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1). The trial court could have reasonably determined these prescriptions, when they were filled, and how often they were filled, were relevant and would assist it in assessing punishment. *See id.* Hinton himself testified that he continued to see Marquardt, obtain prescriptions for testosterone, and fill those prescriptions despite the warnings from F.S.'s doctors to stop using the testosterone cream while the infant was in his care. Accordingly, the trial court did not abuse its discretion in admitting evidence of the defendant's testosterone prescriptions. Even if we assume without deciding this was error, such would be harmless given the unchallenged admission of evidence elsewhere proving the same facts in the form of medical records and Dr.

17

Girardet's testimony. *See Ethington*, 819 S.W.2d at 858. We overrule this ground for review.

**Video of F.S. Crying**

Hinton's fourth issue on review complains about the trial court's admission of a video of F.S. crying. During trial, when the State sought to introduce video evidence of F.S. crying in the hospital, the defense objected "to any hearsay statements on [the video]." The State pointed out that while there were people talking in the background, they were not offering the video for the truth of those background statements, only "for the purposes of hearing F.S.'s crying." The Court ruled that F.S.'s crying was non-testimonial in nature, and the defense confirmed its objection was to the other people speaking in the room. The trial court overruled the objection and admitted the video.

On appeal, Hinton argues the admitted video of F.S. crying "was not connected to the alleged testosterone prescribed." This apparent relevance argument on appeal does not comport with the defendant's hearsay objection at trial, and therefore, Hinton has failed to preserve this complaint for our review. *See* Tex. R. App. P. 33.1(a); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (explaining whether complaint is preserved depends on whether the appellate complaint comports with the trial complaint); *Wilson v. State*, 71 S.W.3d 346, 349

(Tex. Crim. App. 2002) (noting "point of error on appeal must comport with the objection made at trial).

**Summary of Medical Records**

In his sixth ground for review, Hinton appears to complain about the trial court's admission of a summary of the medical records prepared by the State.[11] The State sought to introduce a timeline and summary of the admitted medical records. Hinton objected, stating that "the summary is in my hand for the first time today and at this moment . . . and . . . we don't know exactly what it's a summary of because the underlying data part of the summary has not been identified specifically." The State countered that it was a chronological summary of evidence admitted in the form of the medical records.

Texas Rule of Evidence 1006 provides that "[t]he proponent may use a summary . . . to prove the content of voluminous writings," and "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Tex. R. Evid. 1006. Here, the trial court overruled

---

[11] Under this ground for review, Hinton argues that "Defense counsel was denied Rules 611 and 1006 being introduced to prove content . . . includ[ing] extraneous offenses." At trial, there was no objection made to the summary based on the inclusion of extraneous offenses. To the extent his argument addresses extraneous offenses in connection with the summary, Hinton has not preserved this complaint for our review, because it does not comport with his trial objection. *See* Tex. R. App. P. 33.1(a); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

19

the defense's objection and specifically found that State "as the proponent . . . has made the originals or duplicate copies of said originals available for examination by Defense and/or copying[,]" which the defense did not challenge. Moreover, the defense noted it had "no objection" to the extensive medical records admitted at trial with business records affidavits, which contained the underlying data for the summary, including physicians' notes, testosterone levels, and testosterone pharmacy records for Hinton's pharmacy prescriptions.[12] We conclude the trial court did not abuse its discretion by admitting the summary into evidence. *See* Tex. R. Evid. 1006; *see also Garraway v. State*, No. 03-14-00595-CR, 2017 WL 1404726, at *4 (Tex. App.—Austin Apr. 11, 2017, no pet.) (mem. op., not designated for pub.) (concluding no abuse of discretion by trial court's admission of summary where exhibit containing the same data had already been admitted as a business record and information in the summary came from that record). Further, even if we assume without deciding that the trial court erred by admitting the summary, since other evidence admitted at trial contained the same information, such error was harmless. *See Rodriguez v. State*, 90 S.W.3d 340, 374 (Tex. App.—El Paso 2001, pet ref'd.) (noting any error in admitting summaries was harmless when contained information of other evidence).

---

[12] The defense's only exception to this was its objection to Dr. Girardet's report contained in the medical records.

**Other Grounds for Review**

Even liberally construing Hinton's brief, we are unable to construe the remaining items listed in Hinton's "Grounds for Review" as complaints for our consideration on appeal.[13] *See* Tex. R. App. P. 38.9. They do not complain about the admission of evidence or raise any legal arguments in support thereof. Having overruled Hinton's "Grounds for Review," we affirm the trial court's judgment.

**Conclusion**

We conclude: (1) Hinton failed to preserve his relevancy complaint regarding the video of F.S. crying; (2) the trial court did not abuse her discretion by admitting evidence of marijuana found in the home and testosterone prescriptions; and (3) the error, if any, regarding overruled objections was rendered harmless where unchallenged evidence came in elsewhere proving the same facts. We affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on July 28, 2020
Opinion Delivered January 20, 2021
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.

---

[13] The remaining "Grounds for Review" randomly cite to cases, rules, and statutes without any explanation of how they are tied to the record and are devoid of any complaint about any particular evidence.